IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JUAN MIGUEL RUBIO,

|  |  |
|---|---|
| Plaintiff, | CV-06-873-ST |
| v. | FINDINGS AND RECOMMENDATION |

HAROLD SKELTON, CITY OF SANDY,
OREGON, MICHAEL HELTON, KALEN
TAYLOR, JASON COATES, MANOLO
HERRERA, LINDA MALONE, SCOTT
LAZENBY,

_____ Defendants. _____

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Juan Miguel Rubio ("Rubio"), alleges six claims against the City of Sandy,

Oregon ("City"), and its Mayor (Linda Malone), Chief of Police (Harold Skelton), City Manager

(Scott Lazenby), and several police officers (Michael Helton, Kalen Taylor, Jason Coates, and

Manolo Herrera) under 42 USC §§ 1983 and 1985 for violating his constitutional rights and an

1 - FINDINGS AND RECOMMENDATION

additional eight claims against the City under the Oregon Tort Claims Act for false arrest, malicious prosecution and intentional and negligent infliction of emotional distress. The claims arise out of the denial of a parade permit to Rubio and his subsequent arrest on July 7, 2005, at the Sandy Mountain Festival parade, the modification of his release conditions in December 2005 based on an allegedly false police report, and a stop and search on February 5, 2006.

This court has original jurisdiction under 28 USC § 1331 and supplemental jurisdiction under 28 USC § 1367. Defendants have filed a motion for summary judgment against all claims (docket # 28). For the reasons set forth below, that motion should be granted in part and denied in part.

## **STANDARDS**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir) (emphasis in original) (citation omitted), *cert denied*, 493 US 809 (1989). The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec.*

*Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Id* (citation omitted).

## UNDISPUTED FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence most favorably to Rubio.  A review of the parties' submissions, including affidavits, declarations, and deposition excerpts,[1] reveal the following facts:

## I.  City's Organization

The City operates under the council-manager form of government.  The City Council is composed of a mayor and six elected councilors.  The City Council sets policy which the city manager carries out.  Neither the mayor nor any individual member of the City Council have direct authority regarding the training, supervision, or discipline of police personnel.  Instead, the City Council as a whole has supervisory authority over the city manager.

The mayor is an elected official who presides over all City Council meetings, has a vote on all questions and has authority to preserve order, enforce the rules of the City Council and determine the order of business under the rules of the City Council.  The mayor appoints committees provided by the rules of the City Council, and signs all records of proceedings approved by the City Council.  At all relevant times, Linda Malone ("Malone") was the City's mayor.

///

---

[1] The parties have submitted documents with various attachments.  Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

3 - FINDINGS AND RECOMMENDATION

Scott Lazenby ("Lazenby") was the City Manager at all relevant times. The City Manager delegates operation of the Sandy Police Department and supervision of the officers to the Chief of Police. As do other department directors, the Chief of Police reports directly to the city manager.

## II. **Sandy Police Department and Officers**

Harold Skelton ("Skelton") has been a police officer with the City since 1976 and its Chief of Police since 2003. Through 2004, Chief Skelton had accumulated over 1,390 hours of Department of Public Safety Standards and Training ("DPSST"), including over 267 DPSST hours regarding supervisory responsibilities and mid management and executive development and management training.

The Chief of Police has authority and responsibility for the management, direction and control of the operations and administration of the Sandy Police Department. Commanding officers under the supervision of the Chief of Police have authority to direct and coordinate personnel under their authority. The Chief of Police and supervisory officers have the responsibility to guide, direct, motivate and train those personnel under their supervision to assure that police officers perform their jobs in a competent and lawful manner. Supervisors are responsible for their subordinates' performance, conduct and adherence to department directives and policies. Supervisors are authorized to initiate disciplinary action.

## III. **Carlos Rubio**

On June 25, 2004, Kalen Taylor ("Taylor") conducted a routine traffic stop involving Rubio's son, Carlos Rubio, in a grocery store parking lot in Sandy, Oregon. During that traffic stop, Taylor called for back up, resulting in at least four officers being present. Carlos Rubio

4 - FINDINGS AND RECOMMENDATION

placed a telephone call to his father and asked him to come to the scene due to the number of officers.

At the time of this traffic stop, Taylor did not know Rubio or his son, but had seen them or their vehicles in the City before.  Taylor Decl., ¶ 2.  Taylor called Rubio and Carlos Rubio "homies," which Rubio found highly offensive given that Taylor is a Caucasian male and Rubio and his son are Latino (Hispanic).[2]  Rubio Decl., ¶ 3.  At least five times during the encounter, Michael Helton ("Helton") yelled at Rubio to get out of the parking lot, or he would "fuck up" and "fuck over" Rubio and his son.[3]  *Id* at ¶¶ 4-5.

Within the next few days, Rubio went to the City police station.  In a meeting that lasted about an hour and a half, Rubio complained to Chief Skelton about the racial and threatening conduct of Taylor and Helton during the traffic stop, including calling Rubio and his son "homies," threatening him with profane language, and refusing to let Rubio get out of his vehicle and threatening Rubio with arrest.[4]  *Id* at ¶ 7; Skelton Depo., pp. 98, 121-22.

Two or three weeks later on July 17, 2004, Sandy police officer Ernie Roberts arrested Carlos Rubio for reckless driving.  Taylor was a backup officer in that arrest.  The District Attorney's office later charged Carlos Rubio with eluding, which is a felony.

---

[2]  Taylor contends that he did not address Rubio as "homie," but is uncertain whether he used that term with regard to Carlos Rubio.  He also asserts that he "grew up in the Hispanic culture in Anaheim, California," that the term "homie" is used "as a means of connecting with people" in that area and that he "never used the term 'homie' in a derogatory way."  Taylor Decl., ¶ 3.

[3]  Helton contends that he did not use these terms, but instead told Rubio to "get back in his . . . fucking vehicle or I'll take you to jail for interfering with officers" because he believed Rubio was interfering with a lawful traffic stop.  Helton Depo., p. 61.

[4]  The record does not reveal what action, if any, Chief Skelton took during the days and weeks that follow these complaints by Rubio.  However, at some point during the next year, Chief Skelton spoke with the officers, concluded that no further action was warranted based on the officers' versions of what transpired, and conveyed that information to City Manager Lazenby.

5 - FINDINGS AND RECOMMENDATION

**IV.  March 19, 2005 Report by City Manager Lazenby**

On March 19, 2005, City Manager Lazenby contacted the Sandy Police Department and reported that on March 16, 2005, an acquaintance had told him that Carlos Rubio had recently threatened suicide and that Rubio had stated that if his son killed himself, he would blame the Sandy Police Department and kill every member of the Sandy Police Department.  Skelton Decl., ¶ 2 & Exhibit A; Lazenby Decl., ¶ 8.

**V.  Conviction and Subsequent Disappearance of Carlos Rubio**

On May 26, 2005, Carlos Rubio went to trial in the case of *State of Oregon v. Carlos Rubio*, Clackamas County Circuit Court Case No. CR0401123.  After testifying, Taylor approached Rubio at the Clackamas County Courthouse and warned him that he was not going to like what was going to happen to him.  Rubio Depo., pp. 91-93.  Rubio reported this threat to City Manager Lazenby who acted as though Rubio's complaints were unjustified but did not respond with any follow-up communication to Rubio.  Rubio Decl., ¶¶ 9-10.

Carlos Rubio was convicted on the eluding charge and sentenced.  Both Rubio and Carlos Rubio were angry, and Carlos Rubio believed he was a victim of racial profiling.  A little more than a week later on June 5, 2005, Carlos Rubio was reported missing.  Rubio Depo., p. 108; Skelton Decl., Exhibit B.  Rubio blamed the City for his son's disappearance based on the comments by Taylor during the traffic stop and at the courthouse.  Rubio Depo., p. 108.

**VI.  June 7, 2005 Interview of Rubio**

On June 7, 2005, Detective Weinstein ("Weinstein") of the Portland Police Bureau conducted a telephone interview of Rubio.  At that point, the missing person report filed two days earlier had not yet been distributed to other agencies.  Skelton Decl., Exhibit B, p. 2.

Weinstein prepared a report stating that Rubio told him that his son had a history of suicide attempts and had told Rubio and other family members that he wanted to shoot police and may have been entertaining the idea of forcing the police to kill him.  *Id.*  Weinstein's report also states that Rubio said his son was a "gun enthusiast and collector" who owned numerous assault rifles, a Thompson submachine gun, and numerous handguns, but that the gun collection was locked up at someone else's residence.  *Id.*

In June 2005, both verbally and in writing, the Portland Police Bureau reported to the Sandy Police Department that Carlos Rubio had stated his desire to shoot the two Sandy police officers involved in the eluding incident.  Taylor Decl., ¶ 14.

## VII.  June 2005 Telephone Calls to Mayor Malone's Residence

On June 23 and 24, 2005, Rubio telephoned Mayor Malone about his missing son and requested that she look into his complaints.  Rubio Decl., ¶ 19.  During their initial conversation, Rubio "alternated between raging against the police and despair over the whereabouts of his son."  Plaintiff's Exhibit A.  Mayor Malone told him she would look into the matter when she returned from a retreat.  The following afternoon, Rubio again called Mayor Malone who told him that the City's attorney advised her not to discuss the allegations against the Sandy Police Department.  Rubio told Mayor Malone he was a former member of the military and was "at war" with and "ready to do battle" with the City.  Plaintiff's Exhibit A; Rubio Depo., p. 114.

A short time thereafter, Rubio began displaying signs on his work truck that stated, among other things:  (1) "Sandy PD corrupt;" (2) "Sandy PD Profiling;" and (3) the Sandy police were "thugs" and "racist cowards."  Rubio Depo., p. 120.

///

7 - FINDINGS AND RECOMMENDATION

## VIII.  <u>Sandy Mountain Festival Parade Permit Request</u>

Based on the lack of any meaningful response to his concerns, Rubio decided to "take [his] questions to the Chief at the Sandy Mountain Festival Parade on or about July 7, 2005." Rubio Decl., ¶ 22.

The Sandy Mountain Festival ("SMF") is a registered non-profit entity and has a mailing address, telephone number, and email address, separate and distinct from the City.  Chief Skelton has never been on the SMF Board of Directors.

The SMF conducts an annual parade consisting of about 100 entries.  All prospective parade entrants must submit an application.  The rules and regulations governing the SMF Parade ban entries "advocating, posing or depicting any political, social or religious issues." Chief Skelton Decl., ¶ 10.[5]

Linda Parker ("Parker") was on the SMF Parade Board of Directors and acting Chair of the SMF Parade.  She was responsible for processing parade applications and arranging the parade lineup.  Trial Transcript, pp. 139-41.  Applicants with a political agenda are denied a parade permit.  *Id* at 142.

On the morning set for the SMF Parade, Parker received an application submitted by Rubio to drive a "decorated dump truck" in the SMF Parade.  Rubio Depo., p. 123; Plaintiff's Exhibit B.  Parker was aware of the signs Rubio had on his truck critical of the Sandy police. Parker met with Chief Skelton to discuss Rubio's parade permit request.  Chief Skelton advised Parker that he saw "nothing wrong with it" if Rubio wanted "to go through the parade with pictures of his missing son on the sides of his truck to raise public awareness," but that, in his

---

[5] Although the record does not contain a copy of the SMF Parade rules, Rubio did not dispute Chief Skelton's declaration as to their contents.

8 - FINDINGS AND RECOMMENDATION

opinion, it would be "inappropriate" if Rubio wanted to "drive his truck through the parade with the signs showing derogatory comments about the police department on the back." Plaintiff's Exhibit B, p. 1. Chief Skelton emphasized that the "decision was theirs." *Id*.

After meeting with Chief Skelton, Parker contacted Rubio, inquired as to the "nature of the decoration" and advised Rubio to remove any signs from the back of his truck to be in the parade which Rubio declined to do, saying it was "not worth it." *Id*; Rubio Depo., pp. 126-27.

## IX.  July 7, 2005 SMF Parade and Arrest

On the day of the SMF parade, Rubio handed out pamphlets and drove his decorated truck around the parade route about 20 times. Rubio Depo., pp. 127, 129. However, Chief Shelton and Rubio disagree on virtually every other point related to Rubio's conduct at the parade. Chief Skelton says Rubio drove his truck along the parade route after it was closed (Skelton Decl., ¶ 12); Rubio says he drove his truck along the parade route before it was closed (Plaintiff's Response to Defendants' Concise Statement of Material Facts, ¶ 17). Chief Skelton says that during the parade Rubio approached the car in which he and his wife were riding (Skelton Decl., ¶ 13); Rubio says he waited until the end of the parade when Chief Skelton's vehicle was stopped and the parade princesses were disembarking their vehicle and that he did not interrupt the parade while it was in procession (Rubio Decl., ¶ 24; *see also* Trial Transcript, pp. 123, 136). Chief Skelton says Rubio shouted and waved his arms in an angry and threatening manner (Skelton Decl., ¶ 13); Rubio testified that he yelled loud enough to be heard over the band music and noise of the crowd (Rubio Depo., p. 134), but otherwise denies Chief Skelton's characterization of his behavior (Rubio Decl., ¶¶ 25, 27; *see also*, Trial Transcript, p. 168). Rubio admits to being frustrated by the lack of a response to his concerns about racial

9 - FINDINGS AND RECOMMENDATION

profiling and admits to yelling at Chief Skelton when he approached his car, "Hey, Chief, what's next? You going to give us numbers like the Nazis gave the Jews? When are you going to leave our children alone? Are you going to answer me? Are you a Nazi?" (Rubio Depo., p. 132), but denies making any abusive or insulting remarks at Chief Skelton when he went back into the crowd (Rubio Decl., ¶¶ 20, 27). Chief Skelton did not verbally respond to Rubio's questions and claims that people in the crowd stepped away from Rubio in apparent alarm due to his loud, angry words and behavior (Skelton Decl., ¶ 13), which Rubio again denies (Rubio's Response to Defendants' Concise Statement of Material Fact, ¶ 20; Trial Transcript, pp. 162, 177, 192).

Chief Skelton directed Helton to arrest Rubio, but Helton did not want to get involved because Rubio had previously been upset with him. Chief Skelton therefore had two other officers arrest Rubio. After his arrest, Rubio was transported to the jail by another officer and cited with menacing and disorderly conduct.

## X.  August 1, 2005 City Council Meeting

On August 1, 2005, about a month after the SMF Parade, Mayor Malone apparently presided over a City Council meeting during which two citizens complained about Helton's treatment of four Hispanic youth, an incident which had apparently been reported in a local newspaper in July 2005.[6] *See* Chief Skelton Depo., p. 98; Mayor Malone Depo., p. 57. Mayor Malone testified that the City Council instructed City Manager Lazenby to "investigate with the police to make sure that we weren't profiling." Mayor Malone Depo., p. 60. Mayor Malone

---

[6] Defendants have moved to strike all references to this newspaper article on the basis of hearsay. Defendants' Reply to Plaintiff's Response to Defendants' Concise Statement of Material Fact, p. 3. References to the article are not admitted for the truth of what appeared in the article (which is not in the record in any event), but only to put into context the apparent citizen complaints at the next City Council meeting (the details of which are also not in the record).

never contemplated speaking directly to Chief Skelton or the individual officers involved because it was not her job to do so and would have been "inappropriate." *Id*.

Pursuant to the City Council's instruction, City Manager Lazenby asked Chief Skelton to review arrest and contact records and determine if there was any evidence of racial profiling. Lazenby Deposition Exhibit 1, p. 5.    Chief Skelton told City Manager Lazenby that he did not have the resources to do a statistical analysis, but was familiar with the incidents and contacts and felt there was no evidence that any group(s) had been singled out.   *Id*.   Other than to talk to Chief Skelton, City Manager Lazenby took no further action.   Instead, "unless there's a really compelling reason," he "take[s] the chief's word for how an incident happened."  Lazenby Depo., p. 48.

## XI.  **Discovery of the Remains of Carlos Rubio**

On September 3, 2005, a bow hunter stumbled across the remains of Carlos Rubio in a remote and heavily-wooded area in the Mt. Hood National Forest.[7]   The cause of death was undetermined.   Rubio placed signs on his truck stating that the Sandy Police Department was profiling, his son was murdered, and the Sandy police needed to be held accountable.   Rubio Decl., ¶ 34.   Rubio also admits expressing his belief that Taylor and other City police officers were racist.   *Id* at ¶ 32.

## XII.  **December 11, 2005 Contacts Between Rubio, Coates, and Taylor**

Rubio is a scrap metal hauler and drives in his truck all over the City.   On the morning of December 11, 2005, City police officer Jason Coates ("Coates") was conducting a traffic stop when he noticed Rubio pull his truck into a parking lot across the street.   Plaintiff's Exhibit H,

---

[7] *See* http://web4.co.clackamas.or.us/mrm/1244.html (last accessed March 3, 2008).

p. 2.  The truck bore signs saying "Sandy PD Profiling," "He was Murdered, Sandy PD must be held Accountable" and a banner stating "The 1st Coward ran – the rest are too dumb."  *Id*.  At that time, Coates "kn[ew] . . . Rubio ha[d] made threats that he [would] 'Shoot All Sandy P[olice] D[epartment] Officers.'"  *Id*; Coates Decl., ¶ 2.  Rubio then drove his truck out of the parking lot, looped around and parked near the library, where he was watching Coates.  Plaintiff's Exhibit H, p. 2.  Coates became uncomfortable, quickly issued a warning to the driver he had stopped, and returned to his patrol car.  *Id*.  Rubio remained in the area until Coates drove away.  *Id*.  Coates later saw Rubio's truck parked in a vacant lot near the highway that runs through the City, positioned in a manner to display the signs for traffic on that highway.  *Id*.

Later that same afternoon, Rubio drove his truck in front of Taylor's home.  Rubio Decl., ¶ 35.  Taylor and his wife were in their driveway getting ready to get into their car.  Plaintiff's Exhibit G, p. 2.  Taylor noticed Rubio's truck, bearing the signs, drive slowly past his house and then stop at the intersection.  *Id*.  When he saw Rubio, Taylor ran into the street, yelling at Rubio that he was going to get a restraining order against Rubio.  Taylor Depo., p. 142, 149-52; Rubio Decl., ¶¶ 36-37.  Taylor, alarmed that Rubio was taking photos and knew the location of his personal residence, called Coates, who was the on-duty officer, and told him Rubio was near his residence and was harassing him.  Plaintiff's Exhibit G, p. 2.  Rubio drove his vehicle down a nearby street, then came back toward Taylor's residence, took out a camera, and began to snap more photos.  *Id*.  Taylor later filed an "information[al]" police report in which he stated that he was "documenting this incident, because if Rubio continues to contact me I will be applying for a stalking order in Clackamas County against him."  *Id* at 3.  Coates filed a supporting report.  Plaintiff's Exhibit H.

12 - FINDINGS AND RECOMMENDATION

**XIII.  Modification of Rubio's Release Conditions**

On December 14, 2005, Deputy District Attorney Amy Brenner ("Brenner") filed a

motion to modify the conditions of Rubio's release along with her own supporting affidavit.

Mowery Decl., ¶ 4, Exhibit A.  The motion sought to limit Rubio's contact with City officers and

police and their family members and to prohibit him from possessing weapons or firearms.  *Id*.

There was no motion to arrest Rubio.  *Id*.  Among other information, Brenner's affidavit

referenced Taylor's report of December 11, 2005, but not Coates' report.  *Id*.

The motion to modify was heard by Judge Thomas Rastetter on December 19, 2005, and

both sides appeared.  Judge Rastetter issued an order revoking Rubio's release and remanding

him to the custody of the Clackamas County Sheriff's Office.  Mowery Decl., ¶ 5, Exhibit B.

Rubio was taken into custody at 1:00 p.m. and released on bail the same day.  Rubio Depo.,

p. 186.

**XIV.  February 5, 2006 Stop and Search**

On February 5, 2006, Rubio was driving his truck and saw Coates and another officer,

Manolo Herrera ("Herrera") in their patrol car staring at him.  Rubio Decl., ¶¶ 44-45.  In

response to Rubio pointing at the sign on his truck that said "He was Murdered," Coates gestured

two "thumbs up" and smiled.  Rubio Depo., p. 188.  Following that encounter, Rubio parked his

truck where passers by could read the signs and began to walk home.  *Id*; Rubio Decl., ¶¶ 46-47.

Coates and Herrera were running radar across the street from the sidewalk on which

Rubio was walking.  Rubio, who was unarmed, had both his hands in his coat pockets.  The

parties disagree about virtually every other point concerning the incident that followed.  Rubio

asserts that he glanced in the direction of the officers because they were staring at him and

denies making any threatening gestures at Coates and Herrera.  Rubio Depo., pp. 192-93; Rubio Decl., ¶¶ 49-51.  Defendants on the other hand assert that Rubio pointed his right coat pocket at them like he had a gun.  Coates Decl., ¶ 6; Herrera Decl., ¶ 2.  Both Coates and Herrera contend that it appeared there was an object shaped like the muzzle of a gun in Rubio's right pocket.  *Id*. They also state that when Rubio got a little closer to them, he made the same gesture, this time with an object in his right pocket aimed directly at Coates.  Coates Decl., ¶ 7; Herrera, ¶ 2. Based on that threatening act, as well as his knowledge of Rubio's prior threats toward Sandy police officers, Coates believed that Rubio had a firearm.  Coates Decl., ¶ 8.

Coates and Herrera approached Rubio with their hands on their holstered weapons and ordered him to stop, slowly remove his hands from his pockets, and put his hands behind his back.  *Id*; Herrera Decl., ¶ 2.  They recall that they held his hands behind his back, informed him he was being stopped because of his threatening action, and quickly frisked him for weapons.  *Id*. They located a "larger cell phone" in Rubio's left pocket.  Coates Decl., ¶ 9.  The entire encounter lasted about two minutes.  Coates Decl., ¶ 10; Herrera Decl., ¶ 2; Rubio Decl., ¶ 58.

Rubio contends that he was not told why he was being stopped and that twice when he asked "What the hell is going on here?" he was told "Don't worry what's going on here."  Rubio Depo., pp. 192-93; Rubio Decl., ¶ 54.  Rather than a quick pat down on the outside of his jacket or emptying of his pockets to assure there was no gun, Rubio also asserts that Coates and Herrera felt his ankles, thighs, butt, scrotum, chest, and around his shoulders and under his arms.  Rubio Depo., p. 195; Rubio Decl., ¶ 55.  Rubio further asserts that he told the officers to get away from him seven or eight times, to which they responded by laughing and telling him to just go home. Rubio Depo., p. 193; Rubio Decl., ¶ 56.

## **FINDINGS**

14 - FINDINGS AND RECOMMENDATION

**I.  Federal Claims**

    **A.  Federal Claims Alleged by Rubio**

Rubio's first six claims allege violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution.  Each of these six claims is alleged against the City and individual police or City officials.

The first four claims are brought under 42 USC § 1983 ("§ 1983") and allege constitutional violations tied to specific actions, namely:  (1) denial of Rubio's application for a permit to march in the SMF parade (First Claim alleging a violation of the First Amendment against Chief Skelton); (2) arrest without probable cause on July 7, 2005 at the parade (Second Claim alleging a violation of the First, Fourth, and Fourteenth Amendments against Chief Skelton and Helton); (3) filing of false police reports dated December 11, 2005 by Taylor and Coates, resulting in revocation of Rubio's release pending his criminal trial (Third Claim alleging violation of the Fourth Amendment against Taylor and Coates); and  (4) unlawful search and seizure by Coates and Herrera on February 5, 2006 (Fourth Claim alleging a violation of the Fourth Amendment against Coates and Herrera).

The Fifth Claim is brought under 42 USC § 1985(3) ("§ 1985(3)") and alleges a conspiracy to violate Rubio's First, Fourth, and Fourteenth Amendment rights by conspiring to harass, intimidate, punish, and retaliate against Rubio for his public protests of what he contends was racially motivated police misconduct.

Finally, the Sixth Claim is brought under § 1983 and alleges a failure to train claim against the City, Chief Skelton, City Manager Lazenby, and Mayor Malone.

    **B.  Preliminary Issues Relating to the Federal Claims**

        **1.  Fourteenth Amendment**

15 - FINDINGS AND RECOMMENDATION

The Second Claim alleges a violation of the Fourteenth Amendment in addition to the Fourth Amendment. Rubio also alleges a claim under the Fourteenth Amendment in his Fifth Claim (conspiracy) and Sixth Claim (failure to train), premised upon the same underlying conduct supporting the First through Fourth Claims. However, the Fourteenth Amendment does not provide an additional claim when the specific textual provisions of a particular constitutional provision cover the challenged conduct. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 US 266, 273 (1994), quoting *Graham v. Connor*, 490 US 386, 395 (1989). This analytical approach applies where, as here, the claim is grounded in either the First or Fourth Amendment. *See Catletti ex rel. estate of Catletti v. Rampe*, 334 F3d 225, 229 (2nd Cir 2003) (First Amendment) and *Galbraith v. County of Santa Clara*, 307 F3d 1119, 1121 (9th Cir 2002) (Fourth Amendment).

Rubio has not identified any portion of his claims which do not fall under the protection of either the First or Fourth Amendment. Accordingly, defendants should be granted summary judgment against the Second, Fifth, and Sixth Claims to the extent they are premised upon a violation of the Fourteenth Amendment.

### 2. <u>Municipal Liability</u>

Each of Rubio's first five claims alleges that the City is liable for the underlying constitutional violations (under § 1983 (First through Fourth Claims)) or conspiracy (under § 1985(3) (Fifth Claim)) based on City policies of either: (1) discouraging Rubio's protests against racially motivated police misconduct; or (2) failing to train, supervise, or discipline officers engaging in constitutionally offensive conduct. Complaint, ¶¶ 44, 51, 59, 66, 75. In

16 - FINDINGS AND RECOMMENDATION

addition, Rubio sets out a separate Sixth Claim alleging that the City is liable for the underlying

constitutional violations of the individual defendants under § 1983 by failing to train, supervise,

and discipline its police officers pursuant to a policy or custom of discouraging Rubio's protests.

*Id* at ¶¶ 83-84.

Liability under § 1983 may not be premised on a *respondeat superior* theory.  *Monell v.*

*Dep't of Social Servs. of City of N.Y.*, 436 US 658, 691 (1978).  However, a municipality may be

held liable under § 1983 "when execution of a government's policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy

inflicts . . . injury." *Id* at 694.  Since *Monell*, case law has clarified that a plaintiff may establish

municipal liability by demonstrating that:

> (1) the constitutional tort was the result of a "longstanding practice
> or custom which constitutes the standard operating procedure of
> the local government entity;" (2) the tortfeasor was an official
> whose acts fairly represent official policy such that the challenged
> action constituted official policy; or (3) an official with final
> policy-making authority "delegated that authority to, or ratified the
> decision of, a subordinate."

*Price v. Sery*, 513 F3d 962, 966 (9th Cir 2008), quoting *Ulrich v. City and County of San*

*Francisco*, 308 F3d 968, 984-85 (9th Cir 2002).

When the policy about which the plaintiff complains is an alleged policy of failing to

train police officers, the plaintiff must show that:

///

> (1) he was deprived of a constitutional right; (2) the City had a
> training policy that "'amounts to deliberate indifference to the
> [constitutional] rights of the persons' with whom [its police
> officers] are likely to come into contact'"; and (3) his
> constitutional injury would have been avoided had the City
> properly trained those officers.

17 - FINDINGS AND RECOMMENDATION

*Blankenhorn v. City of Orange*, 485 F3d 463, 484 (9th Cir 2007), quoting *Lee v. City of Los Angeles*, 250 F3d 668, 681 (9th Cir 2001).

Rubio alleges that his constitutional rights were deprived by four specific actions taken by City police officers.  Although Rubio names the City as a defendant in each of the first four claims, his allegations of municipal liability appears to be premised either on the theory the actions were taken by an official with policymaking authority (Chief Skelton) or that the City had a longstanding practice of ignoring complaints of, and failed to train its police officers to avoid, racial profiling.  To the extent the first five claims allege a claim based on this latter theory, they are subsumed into the Sixth Claim for failure to train.

As discussed in more detail below, municipal liability is inappropriate with regard to the First, Third, and Fifth Claims because Rubio has failed to establish an underlying constitutional violation.  Simply put, a public entity is not liable for § 1983 damages under a policy that can cause constitutional deprivations absent constitutional harm to the plaintiff pursuant to the policy.  *Quintanilla v. City of Downey*, 84 F3d 353, 355 (9th Cir 1996), *cert denied*, 519 US 1122 (1997), citing *City of Los Angeles v. Heller*, 475 US 796, 799 (1986) (*per curiam*).  Rubio's allegations of municipal liability premised on a failure to train are discussed in the context of the Sixth Claim and his allegations of municipal liability based on the remaining theories are discussed, as necessary, in the context of the claims to which they pertain.

*///*

### C.  Denial of Parade Permit (First Claim)

The First Claim alleges that Chief Skelton, acting in both his individual and official capacities, and the City violated Rubio's right of free speech under the First Amendment by denying him a permit to drive his decorated truck in the SMF parade.  Defendants seek summary

18 - FINDINGS AND RECOMMENDATION

judgment against this claim based on the absence of state action because Rubio's parade permit was denied by an SMF official, not by Chief Skelton or the City.

A plaintiff proceeding under § 1983 must demonstrate both the deprivation of a right secured by the United States Constitution or laws and that the defendant acted under color of state law. In determining whether the challenged conduct was taken under color of federal law, the question posed is whether the alleged infringement of federal rights is fairly attributable to the government. *Kirtley v. Rainey*, 326 F3d 1088, 1092 (9th Cir 2003) (citations omitted). The case law has distilled four tests to identify state action: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. *Id* (citations omitted). The present record fails to show that the denial of Rubio's application to participate in the SMF parade is "fairly attributable to the government" under any of these tests.

The processing of parade entry applications is not "both traditionally and exclusively governmental," obviating any contention that Rubio can satisfy the "public function" test. *Id* at 1093. Nor does the evidence reveal that the SMF was under any "government compulsion" to process parade entry applications in any particular manner – or to process them at all. *Id* at 1094. This leaves the "joint action" and "nexus" tests, which appear to be the tests on which Rubio relies.

///

The "joint action" test "focuses on whether the state has so far insinuated itself into a position of interdependence with [the private actor] that it must be recognized as a joint participant in the challenged activity." *Franklin v. Fox*, 312 F3d 423, 445 (9th Cir 2002) (citations and internal quotations omitted). The "nexus" test turns on whether there is "such a 'close nexus between the state and the challenged action' that seemingly private behavior 'may

19 - FINDINGS AND RECOMMENDATION

be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n.*, 531 US 288, 295 (2001), quoting *Jackson v. Metro. Edison Co.*, 419 US 345, 351 (1974).

Rubio points out that the City allows use of a City park for the annual SMF activities and provides a free shuttle bus to and from a parking area to the park (Plaintiff's Exhibit C), provides police coverage, including crowd and traffic control of the SMF parade (Plaintiff's Exhibit D), and has referred to its relationship with the SMF as a "partnership" (Plaintiff's Exhibit E, p. 3). Rubio also contends that the City may have some involvement in the submission of SMF parade permit requests to the Oregon Department of Transportation (Plaintiff's Exhibits D & F, p. 1) and asserts that SMF uses the City's name ("Sandy") in its title and is promoted on the City's website. However, the documents submitted by Rubio on those points neither specify the extent (if any) of the City's involvement in submitting parade permit requests nor indicate that the choice of the name for the SMF (which includes the use of the name "Sandy") was made by City officials. None the facts relied on by Rubio shows sufficient interdependence or a close enough nexus between the City and the SMF to constitute state action. Taken as a whole, this evidence demonstrates nothing more than the minimal and unavoidable contact between City and private officials that routinely occurs when private parties use City facilities for private events.

This leaves the evidence concerning Parker's act of consulting with Chief Skelton before denying Rubio's application to drive his "decorated" truck in the SMF parade. The difficulty with this evidence is that Rubio has submitted nothing to challenge the testimony that it was Parker (on behalf of SMF) – and not Chief Skelton or other City officials – who ultimately decided to deny Rubio's application. Chief Skelton is not and never has been on the SMF Board of Directors. Both Chief Skelton and Parker testified that Chief Skelton advised Parker that it

20 - FINDINGS AND RECOMMENDATION

was up to Parker and the SMF as to whether to allow Rubio to enter his truck into the parade.

Skelton Decl., ¶ 11; Trial Transcript, p. 144.  Rubio asserts that Parker told him that Chief

Skelton thought the signs on Rubio's truck that were critical of police were "inappropriate," but

that signs to raise public awareness about his missing son would not be inappropriate.  Rubio

Depo., pp. 126-27.  Rubio also contends that Parker told him that he could drive his truck in the

parade if he removed the signs critical of Sandy police or replaced them with signs to raise

public awareness about his missing son.  *Id*.  However, none of this evidence contradicts the

testimony by Parker and Chief Skelton that after expressing his opinion, Chief Skelton told

Parker that the decision was up to her and the SMF.

Although Rubio denies that the SMF Parade rules prohibit political messages as

contended by the City (Plaintiff's Response to Defendants' Concise Statement of Material Facts,

¶ 12), the critical issue here is who made the decision to deny Rubio's parade entry application.

The only evidence on that point is that Parker made the decision, not any City official.  This is

fatal to Rubio's First Claim.  *See Reinhart v. City of Brookings*, 84 F3d 1071 (8th Cir 1996).

In sum, Rubio has failed to submit evidence of a sufficient interdependence between the

SMF and the City or a sufficient nexus between the City and the SMF's action of denying his

parade permit application.  Accordingly, Chief Skelton should be granted summary judgment

against the First Claim.  As discussed above, this failure of proof on the underlying

constitutional claim is also fatal to Rubio's claim against the City, *Quintanilla*, 84 F3d at 355.

Therefore, the City also should be granted summary judgment against the First Claim.

**D.  <u>Arrest Without Probable Cause (Second Claim)</u>**

The Second Claim alleges that Chief Skelton and Helton, acting in both their individual and official capacities, and the City violated his rights under the First and Fourth Amendments[8] by arresting him without probable cause at the SMF parade. Defendants seek summary judgment against this claim because Helton had no direct involvement and probable cause existed for Rubio's arrest.

### 1. __Helton__

In his response to defendants' motion for summary judgment, Rubio asserts that because Chief Skelton did not have probable cause to order his arrest, each police officer who participated in the arrest violated his right of free speech. Helton is the only other officer named as a defendant in the Second Claim. However, the record reveals that when Chief Skelton asked Helton to arrest Rubio based on his behavior at the parade, Helton declined to do so, stating that Rubio "had previously expressed upset with him." Skelton Decl., ¶ 16. As a result, two other officers arrested Rubio, and a third officer transported him to the jail where he was cited for menacing and disorderly conduct. *Id* at ¶ 17. Because Helton was not involved in Rubio's arrest at the SMF parade, he should be granted summary judgment against the Second Claim. *Taylor v. List*, 880 F2d 1040, 1045 (9th Cir 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant.") (citation omitted). This leaves only Chief Skelton and the City to answer for the constitutional violation alleged in the Second Claim.

### 2. __Legal Standards: The Interface of the First and Fourth Amendments__

Although the Second Claim is titled as a claim for arrest without probable cause, Rubio alleges a violation of both the First and Fourth Amendments. These claims are intertwined; the

---

[8] As discussed above, defendants' alternative request for summary judgment against the Second Claim should be granted to the extent it is premised on the Fourteenth Amendment.

thrust of Rubio's Second Claim is that defendants arrested him without probable cause in order to punish him for exercising his right under the First Amendment to protest racially motivated police misconduct.

### a. First Amendment Retaliation Prohibited

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 US 92, 95 (1972) (citations omitted). Thus, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 US 250, 256 (2006). "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Texas v. Hill*, 482 US 451, 461 (1987). "[W]hile police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas, Az.*, 904 F2d 1372, 1378 (9th Cir 1990). On the other hand, "[t]he First Amendment does not prevent enforcement of disorderly conduct statutes so long as they are not vague or applied to curb protected speech." *Id* at 1377. The same is true of other criminal statutes, including ones similar to those cited by defendants. *United States v. Curtin*, 489 F3d 935 (9th Cir 2007) (recognizing, in context of challenge to evidentiary ruling, protected First Amendment right to possess and read prurient stories and to fantasize about criminal sexual conduct, but not to violate criminal statutes prohibiting sexual solicitation of a minor or travel across state lines for same); *Hargis v. Foster*, 312 F3d 404, 414 (9th Cir 2002) ("[T]here are prohibitions against verbalized threats that constitute assault or extortion even by otherwise law-

23 - FINDINGS AND RECOMMENDATION

abiding citizens under the theory that such speech is more directly tied to an act than protected

expression.") (citation omitted); *United States v. Poocha*, 259 F3d 1077, 1080-82 (9th Cir 2001)

(upholding conviction for disobeying a lawful order, reversing conviction for disorderly conduct,

and discussing other cases involving criticism of the police).

### b.  Fourth Amendment Probable Cause

Whether a warrantless arrest is constitutionally valid depends upon whether, at the

moment of arrest, the officer had probable cause to make the arrest.  *United States v. Martin*, 509

F2d 1211, 1213 (9th Cir 1975) (citation omitted), *cert denied*, 421 US 967 (1975).  The existence

of probable cause negates a § 1983 claim based on an alleged false arrest and the legality of the

arrest is not affected by the subsequent dismissal or acquittal of the charges.  *Pierson v. Ray*, 386

US 547, 555 (1967); *Benson v. Hightower*, 633 F2d 869, 871 (9th Cir 1980) (citing *Pierson*), *cert*

*denied*, 454 US 820 (1981).

Arresting officers have probable cause if, at the time of arrest, the facts and

circumstances within their knowledge and of which they have reasonably trustworthy

information, were sufficient to warrant a prudent person in believing that the arrested person had

committed or was committing an offense.  *Martin*, 509 F2d at 1213.  Where the facts are not in

dispute, the question of whether there was probable cause to arrest is one of law for the court.

*See Linn v. Garcia*, 531 F2d 855, 861 (8th Cir 1976).  The court will consider all the facts known

to the officers and consider all the inferences that could be drawn by them before arrest.  *Id*

(citation omitted).  The Fourth Amendment requires a standard of reasonableness, not certainty,

and a sufficient probability is the touchstone of reasonableness.  *Hill v. California*, 401 US 797,

804 (1971).

24 - FINDINGS AND RECOMMENDATION

Furthermore, the subjective intent of the arresting officer is irrelevant to the probable cause inquiry: "Subjective intentions play no role in the ordinary, probable cause, fourth amendment analysis." *Whren v. United States*, 517 US 806, 813 (1996); *see also Arkansas v. Sullivan*, 532 US 769, 771 (2001). "If the facts known to an arresting officer are sufficient to create probable cause, the arrest is lawful, regardless of the officer's subjective reasons for it." *Tatum v. City and County of San Francisco*, 441 F3d 1090, 1094 (9th Cir 2006), citing *Devenpeck v. Alford*, 543 US 146, 153 (2004). Finally, "because the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." *Edgerly v. City and County of San Francisco*, 495 F3d 645, 651-52 (9th Cir 2007) (discussing *Devenpeck*).

### c. Alleged Crimes

ORS 133.310 authorizes police officers to make a warrantless arrest when they have probable cause to believe that the person has committed a misdemeanor. Defendants contend that they had probable cause to arrest Rubio at the SMF parade for disorderly conduct, menacing, and harassment.

According to ORS 166.025(1), a person commits the offense of disorderly conduct in the second degree if, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

> (a) Engages in fighting or in violent, tumultuous or threatening behavior;
> (b) Makes unreasonable noise;
> (c) Disturbs any lawful assembly of persons without lawful authority; . . . .

This offense is a class B misdemeanor. ORS 166.025(2).

25 - FINDINGS AND RECOMMENDATION

Under ORS 163.190(1), a person commits the offense of menacing if, "by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury." Menacing is a Class A misdemeanor. ORS 163.190(2).

Finally, although Rubio was not charged with this offense, Chief Skelton contends that Rubio's arrest was also supported with probable cause to believe he violated ORS 166.065(1)(a)(B) under which "[a] person commits the crime of harassment if the person intentionally . . . [h]arasses or annoys another person by . . . [p]ublicly insulting such other person by abusive words or gestures in a manner intended and likely to provoke a violent response."

Harassment is a Class B misdemeanor. ORS 166.065(3).

### 3. <u>Analysis</u>

As discussed above, Rubio and Chief Skelton disagree on nearly every point regarding Rubio's conduct at the SMF parade. However, at this juncture, this court is required to draw every reasonable inference in Rubio's favor. Drawing such inferences leaves no doubt that the Second Claim survives summary judgment. According to Rubio, he yelled insults at Chief Skelton protesting what he viewed to be racially-motivated police conduct. He did so while the parade was disbanding and loudly enough to be heard over the din of the parade entries and spectators, but made no angry or threatening movements and did not attempt to cause or cause any undue alarm to anyone around him. This version of events raises a material issue of fact over whether any reasonable police officer would have believed there was probable cause to arrest Rubio for any of the crimes identified by defendants.

Moreover, Chief Skelton was familiar with Rubio's "decorated" truck bearing signs that were critical of the Sandy police department and knew that Rubio had applied to drive the truck

26 - FINDINGS AND RECOMMENDATION

in the SMF Parade. Rubio had previously complained to Chief Skelton about the conduct of

Sandy police officers. In combination with the content of his comments at the SMF Parade, this

background is sufficient to support Rubio's theory that Chief Skelton arrested Rubio in

retaliation for protected speech. Accordingly, because Rubio's Second Claim depends on factual

issues which must be resolved by a factfinder, Chief Skelton is not entitled to summary judgment

on the merits of Rubio's First and Fourth Amendment claims.

Moreover, the law has long been established that warrantless arrests unsupported by

probable cause violate the Fourth Amendment and that criminal prosecution in retaliation for the

exercise of protected speech violate the First Amendment: "Unsurprisingly, it is clearly

established that an arrest without probable cause violates a person's Fourth Amendment rights.

It is equally clear that the First Amendment protects a significant amount of criticism against

police." *Knox v. Sw Airlines*, 124 F3d 1103, 1107-08 (citations omitted) (9th Cir 1997); *see also*

*Nadell v. Las Vegas Metro. Police Dep't*, 268 F3d 924, 929 (9th Cir 2001) ("The right to be free

of government retaliation for the exercise of First Amendment activity . . . was clearly

established at the time Nadell filed her complaint. . . ."), *cert denied*, 535 US 1057 (2002). Thus,

Chief Skelton's request for qualified immunity on the Second Claim should also be denied.

Rubio also seeks to hold the City liable on the Second Claim. He cannot do so under

*Monell*. Although Chief Skelton ordered Rubio's arrest, he did not do so as an official

exercising policymaking authority, and Rubio has presented no evidence that the City officially

condones arrests without probable cause. Instead, Rubio's claim against the City appears to be

premised either on the City's longstanding practice or custom of ignoring complaints of, and/or

failure to train its police officers to avoid, racial profiling. Rubio has presented no evidence of

27 - FINDINGS AND RECOMMENDATION

any such longstanding practice or custom.  At best, the evidence reveals that the City ignored his complaints of racial profiling beginning in June 2005, shortly before the SMF parade. Therefore, Rubio can premise the City's liability under the Second Claim only upon a failure to train.  That claim is subsumed into the Sixth Claim.  As a result, the City should be granted summary judgment on the Second Claim.

### E. __Filing of False Police Reports (Third Claim)__

The Third Claim alleges that Taylor and Coates, in both their individual and official capacities, and the City violated Rubio's Fourth Amendment rights by filing police reports containing baseless and false allegations of threatening behavior by Rubio, which caused revocation of Rubio's release pending his criminal trial, his subsequent rearrest, and being held in custody for several hours until he was able to post bond.  Defendants seek summary judgment against this claim on the basis that neither Coates nor Taylor "rearrested" Rubio.  Rubio attempts to draw an unbroken line between the allegedly false police reports submitted by Coates and Taylor and his stint in jail pending the posting of the bail required by Judge Rastetter's Order. However, this line is decidedly broken.

It is undisputed that Taylor submitted his report for "information" only to document the incident at his home in the event he subsequently decided to seek a stalking order against Rubio. Although Taylor asked that his report be forwarded to Chief Skelton and City Manager Lazenby for review, there is no evidence that Taylor asked that any other action be taken based on his report.  Coates' report similarly asks for no further action but merely documents observations by Coates and is in the nature of a supplementary report in support of Taylor's report.  Its only recommended action is to be attached to Taylor's report.

28 - FINDINGS AND RECOMMENDATION

Shortly after the officers submitted these reports, Deputy District Attorney Brenner sought modification of the conditions of Rubio's release. She did not seek to have Rubio's release revoked, but only to have his conditions modified to prohibit contact with employees of the City and their spouses and to prohibit possession of firearms. Her affidavit references Taylor's report, but her recitation of its contents is one item among many other pieces of information she submitted in support of the modification request.

Rubio contends that since the information in Taylor's report was the only information in her affidavit which took place subsequent to the parade, it must be the sole basis for the request for modification of the release conditions. However, that conclusion is purely speculative because nothing in the record establishes the information that supported the original release conditions. Rubio, through his attorney, appeared telephonically at the hearing for modification of his release conditions and admits that his attorney had an opportunity to offer arguments against any modification, presumably including any arguments regarding the veracity of the information in Brenner's affidavit. Nonetheless, Judge Rastetter ordered the revocation of Rubio's release, and Rubio was taken into custody until he was able to post bond a few hours later.

Neither Taylor nor Coates prepared an affidavit in support of the request for modification of the conditions of Rubio's release, nor did they request modification of his release conditions, much less his arrest. Similarly, there is no evidence that Taylor or Coates requested any action based on their reports or that they knew what use was being made of their reports. Absent such evidence, Rubio is unable to link the filing of the informational reports by these defendants to Brenner's independent act of seeking a modification of Rubio's release conditions. Furthermore,

29 - FINDINGS AND RECOMMENDATION

Brenner's affidavit contains evidence in addition to defendants' reports which itself would have been sufficient to justify modification of the conditions of Rubio's release.  Finally, Rubio's attorney had an opportunity to make any arguments on Rubio's behalf and the matter was decided by a judge.  Taken together, these circumstances break the causal link necessary to maintain a Fourth Amendment claim against Taylor or Coates based on their actions of allegedly filing false police reports on December 11, 2005:  "[T]he prosecutor who filed the complaint and the magistrate who bound [the defendant] over to the Superior Court are both law trained and are both immune from tort liability for their official decisions.  It would be ironic if the presumably independent decisions of these immune officers would automatically result in enhanced liability for the nonimmune police officers."  *Smiddy v. Varney*, 803 F2d 1469, 1472 (9th Cir 1986).

The undisputed evidence fails to support a causal link between the allegedly false reports prepared by Taylor and Coates and Rubio's "rearrest."  Therefore, Taylor and Coates should be granted summary judgment against the Third Claim.  As discussed above, this failure of proof on the underlying constitutional claim is also fatal to Rubio's claim against the City.  *Quintanilla*, 84 F3d at 355.  Therefore, the City also should be granted summary judgment against the Third Claim.

**F.  Unlawful Search and Seizure (Fourth Claim)**

The Fourth Claim alleges that Coates and Herrera, in both their individual and official capacities, and the City violated Rubio's Fourth Amendment rights by stopping and searching him on February 5, 2006, without a reasonable suspicion that he was engaged in criminal conduct.

30 - FINDINGS AND RECOMMENDATION

"Arrests and detentions are both 'seizures' under the Fourth Amendment, but only the former requires a showing of probable cause, while the latter can be justified by reasonable suspicion of criminal activity."  *United States v. Charley*, 396 F3d 1074, 1079-80 (9th Cir 2005) (citations omitted).  Investigatory detentions are a limited exception to the warrant requirements of the Fourth Amendment.  While "not all seizures of the person must be justified by probable cause," *Terry v. Ohio*, 392 US 1 (1968), and its progeny create only a limited exception based on an "articulable suspicion that a person has committed or is about to commit a crime."  *Florida v. Royer*, 460 US 491, 498 (1983).  However, this limited exception requires justification both as to the scope and duration of the seizure:

> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect.  The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case.  This much, however, is clear:  an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means available to verify or dispel the officer's suspicion in a short period of time.  It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Id* at 499 (citations omitted).

Defendants seek summary judgment against Rubio's Fourth Claim on the basis that Coates and Herrera had a reasonable suspicion that Rubio might be carrying a firearm.  They contend that their knowledge of earlier statements by Rubio that he was "at war" and "ready to do battle" with the City and of his threats to hold City police officers "accountable" for the "murder" of his son and to kill City police officers, as well as observing Rubio "glaring" with a

"bulge" in his pocket, combined with the fact that Rubio "pointed his right coat pocket" as if he

had a gun, were sufficient to allow the stop and search.  However, Rubio disputes not only

making any threats, but more importantly the characterization of his conduct while across the

street from Coates and Herrera.  He denies "glaring" or "pointing" his pocket at Coates or

Herrera, and denies that Coates or Herrera could see any "bulge," much less one that looked like

the muzzle of a gun, from their vantage point across two lanes of travel.  Similarly, Rubio

disputes the nature of the search that Coates and Herrera conducted, arguing that rather than a

quick pat down or emptying of his pockets, he was subjected to intrusive poking and prodding

from neck to ankles.

       The difficulty with defendants' position is that Rubio disputes the factual information

critical to defendants' bid for summary judgment.  The key fact cited by defendants to justify

initiation of a stop and search is that Rubio allegedly "pointed" something in his pocket at them

that they thought looked like the muzzle of a gun.  The other information, including Rubio's

prior sign displays on the side of his truck, their knowledge of Rubio's alleged prior threats,

Rubio's act of "glaring" at them, and even their purported observation of a "bulge" in Rubio's

pocket, do not translate into reasonable suspicion that Rubio violated any of the laws that

defendants cite, including ORS 166.220 (unlawful use of a weapon), 166.250 (unlawful

possession of a firearm), and 163.190 (menacing).  Reasonable suspicion "must be founded upon

a particularized and objective basis for suspecting the particular person stopped of criminal

activity."  *United States v. Rodriguez*, 976 F2d 592, 595 (9th Cir 1992) (emphasis omitted).

When the factors cited "describe too many individuals to create a reasonable suspicion that this

particular [individual] was engaged in criminal activity," the stop and search violates the Fourth

Amendment. *Id*.

This court is mindful of the testimony by Coates and Herrera that they were aware of

allegations of threats by Rubio against the Sandy Police Department and appreciates the

necessity that such threats be taken seriously. *See*, *e.g.*, *Terry*, 392 US at 24 n1 (citing statistics

regarding numbers of law enforcement officers killed in the line of duty). If Rubio did indeed

"point" something hidden in his pocket toward them, then the stop and a search for weapons was

constitutionally justified. However, Rubio disputes that he did any more than glance in their

direction, keep his hands in his pocket, and continue walking. As a result, the request for

summary judgment by Coates and Herrera, as well as their request for qualified immunity,

should be denied.

As with the initiation of a stop, the scope of a permissible search based on reasonable

suspicion is strictly circumscribed. Under *Terry*, a search for weapons "must be limited to that

which is necessary for the discovery of weapons which might be used to harm the officer or

others nearby, and may realistically be characterized as something less than a 'full' search, even

though it remains a serious intrusion." *Terry*, 392 US at 25-26; *see also Kolender v. Lawson*,

461 US 352, 364-65 (1983) (discussing scope of search).

Here again, the parties disagree as to exactly what transpired. Defendants contend Rubio

was "quickly frisked for weapons." Rubio contends it was a neck-to-ankle search involving

areas far more private than the pocket in which defendants allegedly saw a bulge allegedly

pointed at them. Again, this factual dispute prevents summary judgment in favor of Coates and

Herrera either on the merits or on their request for qualified immunity.

33 - FINDINGS AND RECOMMENDATION

Accordingly, summary judgment should be denied to Coates and Herrera on the Fourth

Claim.  With respect to the City, Rubio has not presented any evidence to impose municipal

liability under *Monell*, except as to the City's failure to train.  However, that claim is subsumed

into the Sixth Claim.  As a result, the City should be granted summary judgment on the Fourth

Claim.

**G.  § 1985(3) Conspiracy Claim (Fifth Claim)**

The Fifth Claim alleges a violation of § 1985(3), which protects against conspiracies "for

the purpose of depriving, either directly or indirectly, any person or class of persons of the equal

protection of the laws, or of the equal privileges and immunities under the laws."  In order to

state a claim under § 1985(3), a plaintiff must prove:

> (1) a conspiracy;  (2) for the purpose of depriving, either directly
> or indirectly, any person or class of persons of the equal protection
> of the laws, or of equal privileges and immunities under the laws;
> and (3) an act in furtherance of this conspiracy; (4) whereby a
> person is either injured in his person or property or deprived of any
> right or privilege of a citizen of the United States.

*Sever v. Alaska Pulp Corp.*, 978 F2d 1529, 1536 (9th Cir 1992), citing *United Bhd. of Carpenters*

*and Joiners of Am. v. Scott*, 463 US 825, 828-29 (1983).

In the Ninth Circuit, the plaintiff must also establish "a deprivation of [the protected right

which was] motivated by 'some racial, or perhaps otherwise class-based, invidiously

discriminatory animus.'"  *Id*, quoting *Griffin v. Breckenridge*, 403 US 88, 102 (1971).  Mere

allegations of a conspiracy unsupported by admissible evidence are insufficient to establish a

claim.  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F2d 621, 626 (9th Cir 1988).

Rubio alleges that Chief Skelton, Helton, Taylor, and Herrera conspired to deprive him of

his rights under the First, Fourth, and Fourteenth Amendments by "arriv[ing] at an understanding

34 - FINDINGS AND RECOMMENDATION

and meeting of the minds to harass, intimidate, punish, and retaliate against [Rubio's] public protests denouncing the racially motivated misconduct of Sandy police officers."  Complaint, ¶¶ 72-73.

Rubio attempts to support his conspiracy theory by pointing to the acts underlying his first four claims, namely Chief Skelton's recommendation to deny Rubio's application to appear in the parade and later order to arrest Rubio at the SMF parade, the filing of allegedly false police reports by Taylor and Coates on December 11, 2005, and the alleged unlawful stop and search by Coates and Herrera on February 5, 2006.  *Id* at ¶ 74.  However, missing from the record is any evidence which supports a conspiratorial link between any of these actions.

Taylor and Helton participated in the stop of Carlos Rubio on June 25, 2004, when Taylor allegedly referred to Rubio and his son as "homies" and Helton allegedly threatened Rubio with profane language.  A few weeks later on July 17, 2004, Taylor was a backup officer in the arrest of Carlos Rubio for reckless driving.  Ten months later on May 27, 2005, Taylor approached Rubio at the courthouse after testifying in the criminal trial for eluding against Carlos Rubio and said Rubio "was not going to like what was going to happen to [him]."  Rubio Decl., ¶ 8.  While this is certainly evidence of growing animosity between Rubio and Taylor, the record contains no evidence of any connection between these earlier events and Chief Skelton's recommendation to Parker to deny Rubio's parade entry application and order to arrest Rubio based on his behavior at the parade on July 7, 2005.  To the contrary, the evidence indicates that Chief Skelton initially asked Helton to arrest Rubio, but Helton declined to get involved.  Skelton Decl., ¶ 16.  As a result, two other officers arrested Rubio at the SMF parade and a third officer transported him to the jail.

35 - FINDINGS AND RECOMMENDATION

The next event cited by Rubio is the filing of allegedly false police reports by Taylor (Plaintiff's Exhibit G) and Coates (Plaintiff's Exhibit H) on December 11, 2005, already discussed.  Finally, Rubio points out the February 5, 2006 stop and search by Coates and Herrera.  While it is undisputed that Rubio had multiple encounters with Sandy police, no evidence supports the conclusion that these encounters were motivated by discriminatory animus or as a result of a meeting of the minds between defendants to violate Rubio's rights.  Missing from the record is any evidence, other than speculation, that the individual defendants reached an agreement to target Rubio due to his race.  The fact that Rubio is Latino and the fact that he had multiple encounters with police is not enough to carry the day:

> To establish the existence of a conspiracy, a plaintiff must show that the conspirators agreed to inflict injury upon him; in other words, that they acted with a single plan, the general nature and scope of which was known to each conspirator.  Agreement may be inferred from circumstantial evidence, but only if it is sufficient to permit a reasonable jury to conclude that a meeting of the minds has occurred and that the parties had an understanding to achieve the conspiracy's objectives.

*Green v. Benden*, 281 F3d 661, 665 (7th Cir 2002), citing *Hernandez v. Joliet Police Dep't*, 197 F3d 256, 263 (7th Cir 1999).

Rubio's submissions do not establish that any of the individual defendants did anything more than respond on a case-by-case basis to their various encounters with him.  While one or more of those encounters may provide the basis for a constitutional claim by Rubio, taken as a whole, they do not support a conspiracy claim because they lack the critical element of an agreement between two or more defendants.

Rubio also alleges that the conspiracy by Chief Skelton, Helton, Taylor, Coates, and Herrera was conducted pursuant to informal City policies and/or customs of discouraging

36 - FINDINGS AND RECOMMENDATION

Rubio's protests and informal policy of failing to train, supervise, or discipline police officers.

Complaint, ¶ 75. According to Rubio, because defendants failed to raise the issue of municipal

liability regarding the Fifth Claim, they cannot argue the absence of a genuine issue of material

fact as to the City's liability if any individual defendant committed a constitutional violation.

This argument conflates municipal liability with respect to Rubio's claims under § 1983 and

§ 1985(3). With respect to the Fifth Claim brought under § 1985(3), due to a lack of evidence,

no reasonable jury could conclude that there was an underlying conspiracy. This lack of

evidence defeats not only the claims against the individual defendants, but also any claim against

the City under § 1985(3) premised upon municipal policies or practices. Accordingly,

defendants' motion for summary judgment should be granted against the Fifth Claim.

### H. __Failure to Train, Supervise and Discipline (Sixth Claim)__

The Sixth Claim alleges that Chief Skelton, Mayor Malone, City Manager Lazenby, and

the City failed to train, supervise, and discipline employees of the City police department who

were engaged in a pattern of constitutional violations against Rubio. As Rubio's response

clarifies, these allegations are premised upon the alleged knowledge of and failure to investigate

or deter racial profiling and failure to train police officers to avoid this type of unconstitutional

conduct.

As discussed above, a municipality may not be held liable for § 1983 damages under a

policy that can cause constitutional deprivations absent constitutional harm to the plaintiff

pursuant to the policy. *Quintanilla*, 84 F3d at 355. This same rule holds true for claims of

supervisory liability. *Id* (upholding judgment in favor of police chief and city based on jury's

special verdict that plaintiff's rights were not violated). Rubio alleges a policy of failing to train,

37 - FINDINGS AND RECOMMENDATION

supervise, and discipline officers involved in racial profiling.  However, as discussed above, two

of the four underlying acts alleged by Rubio do not support a claim for any constitutional

violation.  Thus, it is the remaining acts, namely the arrest at the SMF Parade (Second Claim)

and the stop and search on February 5, 2006 (Fourth Claim), which must be evaluated in the

context of deciding Rubio's municipal and supervisory liability claims premised on a failure to

train, supervise, and discipline.

### 1. Supervisory Liability

In "limited circumstances" a person can be subject to liability under § 1983 for the acts of

others.  "Although there is no pure *respondeat superior* liability under § 1983, a supervisor is

liable for the constitutional violations of subordinates 'if the supervisor participated in or

directed the violations, or knew of the violations and failed to act to prevent them.'"  *Hydrick v.*

*Hunter*, 500 F3d 978, 988 (9th Cir 2007), quoting *Taylor*, 880 F2d at 1045, *petition for cert filed*,

76 USLW 3410 (January 17, 2008) (No. 07-958).  The Ninth Circuit recognizes three paths to

supervisory liability under § 1983:

> [S]upervisors can be held liable for: 1) their own culpable action
> or inaction in the training, supervision, or control of subordinates;
> 2) their acquiescence in the constitutional deprivation of which a
> complaint is made; or 3) for conduct that showed a reckless or
> callous indifference to the rights of others.

*Edgerly v. City and County of San Francisco*, 495 F3d 645, 660 (9th Cir 2007) (internal

punctuation and citation omitted).

### a. Mayor Malone

According to Rubio, Mayor Malone failed to adequately respond to either:  (1) his

telephone calls to her at her home on June 23 and 24, 2005; or (2) the complaints by two citizens

concerning racial profiling made at the City Council meeting on August 1, 2005.  Rubio Decl.,
¶¶ 19-21; Mayor Malone Depo., pp. 57, 60.

      The difficulty with Rubio's claim against Mayor Malone is the lack of evidence that she
had individual supervisory authority over City Manager Lazenby, Chief Skelton, or any City
police officers.  Although she presided over City Council meetings, the only evidence indicates
that the City Council "as a council" sets City policy and responds to citizen complaints.  Mayor
Malone Depo., p. 60; Defendants' Concise Statement of Material Facts, ¶ 54 (admitted by
Rubio's Response to Defendants' Concise Statement of Material Facts, ¶ 54).  Imposing liability
on Mayor Malone based on this record would amount to the "pure *respondeat superior* liability"
that is not available under § 1983.  *Hydrick*, 500 F3d at 988.  Accordingly, Mayor Malone
should be granted summary judgment against the Sixth Claim.

### b.  City Manager Lazenby

      City Manager Lazenby is charged with carrying out City policy.  Lazenby Decl., ¶ 2.
Rubio's claim against him is premised upon an allegedly inadequate response to:  (1) Rubio's
telephone call in late May or early June 2005 (Rubio Decl., ¶¶ 9-10); and (2) the citizen
complaints made at the City Council meeting of August 1, 2005.  Rubio alleges that City
Manager Lazenby had actual and constructive knowledge that employees of the City police
department were engaging in a continued pattern of constitutional violations against Rubio and
his son, and that his lack of a response constituted deliberate indifference to or tacit authorization
of the offensive practices.  Complaint, ¶¶  81-82.

      The City Manager delegates operation of the police department and supervision of police
officers to the police chief, who in turn reports directly to the City Manager.  Following Rubio's

telephone call in late May or early June 2005, City Manager Lazenby spoke with Chief Skelton about the nearly year-old encounter between Rubio, Taylor, and Helton, and was satisfied that no discipline, additional training, or supervision was warranted. Lazenby Decl., ¶ 7; Skelton Decl., ¶ 23; Lazenby Deposition Exhibit 1, p. 2. Chief Skelton told City Manager Lazenby that the officers said that they did not use the words Rubio accused them of using, although Taylor may have used "Hey, homes" as a way of "addressing situations" which was "not meant as a derogatory thing." Lazenby Depo., p. 32. Based on that conversation with Chief Skelton, City Manager Lazenby concluded that "the whole thing had gotten completely blown out of proportion." *Id* at 33. Five or six weeks after his first complaints to City Manager Lazenby, Rubio was arrested at Chief Skelton's direction at the SMF Parade.

This chain of events simply does not support a claim for supervisory liability against City Manager Lazenby arising out of the arrest of Rubio at the SMF Parade. It is undisputed that Rubio's complaints to City Manager Lazenby in late May or early June 2005 focused on the allegedly threatening and racially-charged actions of Taylor and Helton during the June 25, 2004 traffic stop involving Carlos Rubio and the alleged threat made by Taylor at the Clackamas County Courthouse nearly a year later on May 26, 2005. Following Rubio's telephone call, City Manager Lazenby contacted Chief Skelton and, based on information provided by Chief Skelton, concluded that no discipline or additional training or supervision was warranted.

While Rubio may disagree with City Manager Lazenby's conclusion, the record does not support the inference that Lazenby's conduct between the time of Rubio's telephone call and arrest at the SMF Parade "showed a reckless or callous indifference to the rights of others," such as is required to establish supervisory liability. *Blankenhorn*, 485 F3d at 485 (citations omitted). Nor is there any evidence from which a jury reasonably could conclude that City Manager

40 - FINDINGS AND RECOMMENDATION

Lazenby "knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Id* (citation omitted).

City Manager Lazenby investigated Rubio's complaint, relying on Chief Skelton to report the officers' version of the nearly year-old encounter with Rubio. Rubio does not identify the exact content of his verbal complaint to City Manager Lazenby, instead generally stating that he complained about "behavior . . . on the part of the officers." Rubio Decl., ¶ 9. However, assuming that Rubio's complaints encompassed all of the conduct by Taylor and Helton up to that point, nothing in the record supports the conclusion that City Manager Lazenby knew or reasonably should have known that the failure to take further action would cause others (namely Chief Skelton) to inflict the alleged constitutional injury (arrest at the SMF Parade) that followed. Taylor was not involved in Rubio's arrest at the SMF Parade and Helton's only involvement was to decline to arrest Rubio when requested to do so by Chief Skelton.

Rubio also alleges that City Manager Lazenby failed to adequately respond to the citizen complaints at the August 1, 2005 City Council meeting. Again, the record does not reveal the exact nature of the complaints, just that two citizens complained that Sandy police were engaging in racial profiling, following up on an earlier article in the local newspaper alleging that Helton in particular had engaged in racial profiling. Lazenby Depo. Exhibit 1, p. 5. When asked by City Manager Lazenby to review arrest and contact records and determine if there was any evidence of racial profiling, Chief Skelton responded that he did not have the resources to do a statistical analysis, but was familiar with the incidents and contacts and felt there was no evidence that any group(s) had been singled out. Neither Chief Skelton nor City Manager Lazenby took any further action.

41 - FINDINGS AND RECOMMENDATION

Six months later on February 5, 2006, Coates and Herrera stopped and searched Rubio. Despite the time lag, a reasonable fact-finder could conclude that City Manager Lazenby knew or should have known that inaction would cause the infliction of this alleged constitutional injury. City Manager Lazenby's sole effort to investigate racial profiling was met with protestations by Chief Skelton that the department did not have the resources for statistical research and that he was familiar with the incidents and felt there was no evidence that any group(s) were singled out.  Lazenby Depo. Exhibit 1, p. 5.

However, by that time, City Manager Lazenby was aware not only of Rubio's complaints two months earlier (late May or early June 2005) against two officers (Taylor and Helton) in June 2004, but also of the August 1, 2005 citizen complaints at the City Council meeting of racial profiling by another officer (Helton).  In addition, by late June 2005, Rubio had been arrested at the SMF parade in July 2005 where he drove his truck displaying signs protesting racial profiling by the entire City police department.  Given this background, a fact-finder could reasonably conclude that had City Manager Lazenby performed a broader investigation and/or required additional training or supervision in August 2005, then Rubio may not have been subjected to further racial harassment as allegedly occurred in February 2006 by Coates and Herrera.  By August 2005, the record supports complaints by Rubio and others of racial profiling that could support a claim against City Manager Lazenby for supervisory liability.

Accordingly, City Manager Lazenby's request for summary judgment against Rubio's Sixth Claim should be granted based on Rubio's arrest by Chief Skelton in July 2005, but denied based on the February 5, 2006 stop and search.

### c.  Chief Skelton

42 - FINDINGS AND RECOMMENDATION

As discussed above, any supervisory liability claim must be premised upon constitutionally deficient conduct. As a result, only the SMF Parade arrest and the February 5, 2006 stop and search by Coates and Herrera can support a supervisory liability claim against Chief Skelton.

With regard to the first basis of liability, within a week after the traffic stop involving his son in June 2004, Rubio personally complained to Chief Skelton, accusing Taylor of using racially derogatory language and accusing Helton of making threats against him using profane language and threatening him with arrest. After speaking with the officers, Chief Skelton concluded that no further action was warranted because the officers' versions of what transpired differed radically from the version recounted by Rubio.[9] Chief Skelton conveyed that information to City Manager Lazenby when he inquired about Rubio's complaints in late May or early June 2005. A few weeks later, Chief Skelton arrested Rubio at the SMF Parade.

The problem with this possible basis for supervisory liability is that Chief Skelton is the sole individual defendant.[10] While Chief Skelton may be liable for his own conduct in ordering Rubio's arrest, he may not be held liable both as an individual actor and as a supervisor because he does not supervise himself. Instead, he is supervised by the City Manager. It makes no logical sense for him to be held liable both individually and as a "supervisor" for his own conduct.

---

[9] The record does not reveal when Chief Skelton spoke to the officers, but it was some time between Rubio's complaints and when Chief Skelton told City Manager Lazenby that the officers' version of what had happened differed substantially from the version recounted by Rubio.

[10] As discussed above, Helton should be dismissed as a defendant due to his lack of personal involvement in Rubio's arrest at the SMF Parade.

43 - FINDINGS AND RECOMMENDATION

This leaves the stop and search by Coates and Herrera on February 5, 2006. This court concludes that this claim against Chief Skelton survives summary judgment for the same reasons regarding the claim against City Manager Lazenby. Accordingly, Chief Skelton should be granted summary judgment against the Sixth Claim based on Rubio's arrest in July 2005, but denied based on the February 5, 2006 stop and search.

### 2. **Municipal Liability**

As noted above, municipal liability turns on proof of a constitutional tort resulting from a longstanding municipal practice or custom, the act of an official whose acts fairly represent official policy, or an action by an official with final policy-making authority delegating that authority to a subordinate or ratifying the decision of a subordinate. *Price v. Sery*, 513 F3d at 966. For a failure to train claim, the allegedly inadequate training policy must amount to deliberate indifference to the plaintiff's constitutional rights. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 US 378, 388 (1989). Furthermore, "[u]nder *Harris* and progeny, one must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim." *Price*, 513 F3d at 973 (citation omitted). The plaintiff must prove that proper training would have avoided the constitutional injury. *Blankenhorn*, 485 F3d at 484. As discussed above, the record is insufficient to support the First, Third, and Fifth Claims. This leaves only the Second Claim (allegedly unlawful arrest at the SMF parade on July 7, 2005 against Chief Skelton and the City) and the Fourth Claim (allegedly unlawful stop and search on February 5, 2006 against Coates, Herrera, and the City) as potential sources of liability for the Sixth Claim.

44 - FINDINGS AND RECOMMENDATION

To the degree Rubio alleges that a failure to train resulted in his arrest at the SMF Parade, he relies on his complaints to Chief Skelton (in late June 2004, *see* Rubio Decl., ¶¶ 6-7), City Manager Lazenby (in late May or early June 2005, *see* Rubio Decl., ¶¶ 9-10), and Mayor Malone (in late June 2005; *see* Rubio Decl., ¶ 19-21), to show that the City had notice of a pattern of constitutional violations directed at him.  The evidence indicates that the earlier complaints focused on the actions of two rogue police officers (Taylor and Helton) during the June 2004 encounter with Rubio and his son and Taylor's allegedly threatening courthouse comment nearly a year later.

Evidence that particular officers are not properly trained "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *Canton*, 489 US at 390-91 (citations omitted).  Similarly, "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury."  *Id*.  In this case, the complaints Rubio made about Taylor and Helton (that they called him a racially derogatory term in June 2004 and subjected him to a veiled threat in May 2005) are not logically connected to his arrest without probable cause by Chief Skelton in July 2005.

However, more evidence supports the allegation that Rubio was unconstitutionally stopped and searched on February 5, 2006.  Rubio points to the citizen complaints at the City Council meeting of August 1, 2005 as evidence that the City knew of, but ignored, racial profiling by its police officers.  In addition, it is reasonable to infer that City officials must have known there was a pattern of racial profiling from reading the signs on his truck starting in late June 2005 and his arrest at the SMF parade in July 2005.  This evidence is sufficient to support the inference that City officials had notice by August 2005 of a pattern of allegedly

45 - FINDINGS AND RECOMMENDATION

unconstitutional conduct based on racial profiling generally or directed at Rubio specifically.
Additional training to avoid racial profiling may well have prevented the harm Rubio alleges
took place in February 2006 (stop and search with no reasonable suspicion).  Accordingly, the
City should be granted summary judgment against Rubio's Sixth Claim based on his arrest by
Chief Skelton in July 2005, but denied summary judgment based on the February 5, 2006 stop
and search.

## II.  State Claims

In addition to his federal constitutional claims, Rubio alleges eight state law claims
against the City for:  (1) false arrest based on his arrest at the SMF parade (Seventh Claim);
(2) malicious prosecution (Eighth Claim); (3) intentional infliction of emotional distress based
on Rubio's arrest at the SMF parade (Ninth Claim), the filing of the allegedly false police reports
in December 2005 by Taylor and Coates (Eleventh Claim), the stop and search of Rubio in
February 2006 by Coates and Herrera (Thirteenth Claim); and (4) negligent infliction of
emotional distress based on these same three events (Tenth, Twelfth, and Fourteenth Claims).

### A.  False Arrest/Imprisonment (Seventh Claim)

The Seventh Claim alleges a claim for false arrest against the City based on Rubio's
arrest that the SMF Parade.  A claim for false arrest consists of four elements:

> The gravamen of the claim is the unlawful imposition of restraint
> on another's freedom of movement.  The tort has four elements:
> (1) defendant must confine plaintiff; (2) defendant must intend the
> act that causes the confinement; (3) plaintiff must be aware of the
> confinement; and (4) the confinement must be unlawful.

*Hiber v. Creditors Collection Service of Lincoln County, Inc.*, 154 Or App 408, 413, 961 P2d
898, 901, *rev denied*, 327 Or 621, 971 P2d 413 (1998).

It is undisputed that Rubio was confined following his encounter with Chief Skelton at the SMF Parade, that Chief Skelton intended to arrest Rubio, and that Rubio was aware of his confinement.  This leaves only the issue of whether the confinement was lawful.  As discussed above, a factual issue exists whether Chief Skelton had probable cause to arrest Rubio.  Thus, this claim must await resolution by a factfinder at trial.

**B.  Malicious Prosecution (Eighth Claim)**

The Eighth Claim for malicious prosecution is also premised upon Rubio's arrest at the SMF Parade and subsequent prosecution for disorderly conduct and menacing.  Rubio alleges that the menacing charge was dismissed following a trial.  Complaint, ¶ 30.

A claim for malicious prosecution requires the plaintiff to prove each of the following elements:

> (1) the institution or continuation of the original criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceeding; and (6) injury or damage because of the prosecution.

*Waldner v. Dow*, 128 Or App 197, 199-200, 876 P2d 785, 786 (1994), quoting *Rose v. Whitbeck*, 277 Or 791, 795, 562 P2d 188, 190, *modified on other grounds*, 278 Or 463, 564 P2d 671 (1977).

Proof of probable cause is a complete defense to a charge of malicious prosecution and an acquittal does not prove a lack of probable cause.  The purported existence of probable cause for Rubio's arrest appears to be the City's only contention in support of its motion for summary judgment against this claim.  However, for the same reasons as discussed with regard to the

47 - FINDINGS AND RECOMMENDATION

Seventh Claim, summary judgment must also be denied as against the Eighth Claim due to a

factual dispute as to probable cause.

### C.  <u>Intentional Infliction of Emotional Distress (Ninth, Eleventh & Thirteenth</u>

<u>Claims)</u>

#### 1.  <u>Legal Standard</u>

A claim for intentional infliction of emotional distress ("IIED") requires a plaintiff to

prove that: "(1) defendant intended to inflict severe emotional distress on plaintiff;

(2) defendant's acts were the cause of plaintiff's severe emotional distress; and (3) defendant's

acts constituted an extraordinary transgression of the bounds of socially tolerable conduct."

*Robinson v. U.S. Bancorp*, 2000 WL 435468, *5 (D Or April 20, 2000), citing *McGanty v.*

*Staudenraus*, 321 Or 532, 543, 901 P2d 841, 849 (1995).  It is the role of the court to determine

as a matter of law whether conduct constitutes an extraordinary transgression of the bounds of

socially tolerable conduct.  *Harris v. Pameco Corp.*, 170 Or App 164, 171, 12 P3d 524, 529

(2000).  Conduct that is merely "rude, boorish, tyrannical, churlish and mean" will not satisfy

that standard."  *Patton v. J.C. Penney Co. Inc.*, 301 Or 117, 124, 719 P2d 854, 858 (1986),

*abrogated on other grounds by McGanty*, 321 Or at 544, 901 P2d at 849.  Similarly, "[l]ack of

foresight, indifference to possible distress, even gross negligence is not enough to support this

theory of recovery."  *Hall v. The May Dep't Stores Co.*, 292 Or 131, 135, 637 P2d 126, 129

(1981), *abrogated on other grounds by McGanty*, 321 Or at 544, 901 P2d at 849.  Instead, [t]he

tort requires some extraordinary transgression of the bounds of socially tolerable conduct."  *Id*.

The means of inflicting the harm must be "outrageous in the extreme."  *Patton*, 301 Or at 124,

719 P2d at 858; *Shay v. Paulson*, 131 Or App 270, 273, 884 P2d 870, 872 (1994).

#### 2.  <u>Analysis</u>

48 - FINDINGS AND RECOMMENDATION

The Ninth Claim alleges that Rubio's arrest at the SMF Parade caused him severe emotional distress.  Rubio has submitted some evidence which might support his theory that Chief Skelton possessed a retaliatory motive.  However, other than the fact that he was arrested, Rubio gives no other information that would support a finding that his arrest transgressed the bounds of social toleration.  In short, Rubio relies exclusively on Chief Skelton's alleged motive and the fact of his arrest to support his claim.

It is undisputed that Chief Skelton did not verbally respond to the statements Rubio yelled at him during the SMF parade.  Instead, Chief Skelton told Helton that he thought Rubio ought to be arrested.  When Helton did not want to be involved in the arrest, Chief Skelton ordered other officers to arrest Rubio.  In sum, other than Rubio's contention that the arrest was based on a retaliatory motive and was undertaken in a public place, nothing in the record supports the conclusion that the arrest itself was unusual in any way, much less "outrageous in the extreme."  This is simply not sufficient to support a claim for intentional infliction of emotional distress.

The factual information supporting Rubio's Eleventh and Thirteenth Claims fare no better.  Rubio again alleges retaliatory or discriminatory motives, but provides no evidence to support the conclusion that the means used to take him back into custody after his release was revoked or to search him during the February 5, 2006 incident were "outrageous in the extreme." While Rubio raises issues of fact concerning whether he should have been arrested at the SMF Parade and searched on February 5, 2006, those factual disputes are addressed in Rubio's constitutional claims.  His state law IIED claim cannot be supported simply by the facts of the arrest(s) and search.  Instead, Rubio must submit evidence that the bounds of social toleration

were crossed by the means of those actions.  He has failed to do so.  Accordingly, defendants should be granted summary judgment against the Ninth, Eleventh, and Thirteenth Claims.

### D.  **Negligent Infliction of Emotional Distress (Tenth, Twelfth & Fourteenth Claims)**

The Tenth, Twelfth, and Fourteenth Claims allege claims for negligent infliction of emotional distressed premised upon Rubio's arrest at the SMF parade (Tenth Claim), his "rearrest" based on the allegedly false police reports by Taylor and Coates (Twelfth Claim), and the allegedly unlawful stop and search on February 5, 2006 (Fourteenth Claim).  As a result of these events, Rubio alleges that he suffered severe mental and emotional distress, fear, depression, humiliation, anxiety, loss of liberty, loss of reputation, and inconvenience.  Complaint, ¶¶ 110, 126, 139.

Defendants seek summary judgment against these claims because Rubio has failed to allege that their conduct infringed on a legally protected interest.  In Oregon, "there is no cause of action for purely psychic or emotional injury as such, unsupported by a violation of some more specific duty toward the plaintiff."  *Nearing v. Weaver*, 295 Or 702, 708, 670 P2d 137, 141 (1983).  Instead, when "a plaintiff seeks redress for emotional injury alone, liability for negligence must have a legal source that goes beyond the common-law duty to exercise reasonable care to prevent foreseeable harm."  *Shin v. Sun River Preparatory Sch., Inc.*, 1999 Or App 352, 365, 111 P3d 762, 770, *rev denied*, 339 Or 406, 122 P3d 64 (2005) (citations omitted).

Oregon courts have recognized that some special relationships might give rise to a heightened duty of care.  *See*, *e.g.*, *Curtis v. MRI Imaging Services II*, 148 Or App 607, 620 n11, 941 P2d 602, 609 n11 (1997), *aff'd* 327 Or 9, 956 P2d 960 (1998).  However, Rubio has not alleged any such special relationship with defendants.  Instead, Rubio simply alleges that he had legally protected interests in enjoying his right to free speech and in being protected from arrests

50 - FINDINGS AND RECOMMENDATION

without probable cause and stops and searches without reasonable suspicion. Were this

sufficient to state a claim for negligent infliction of emotional distress, every person dissatisfied

with a police encounter would potentially have such a claim. This court finds no support in the

case law for such a broad interpretation of Oregon's requirements for a claim of negligent

infliction of emotional distress. To the contrary, *Nearing* dispelled any notion that a general

duty by police to protect the community at large was sufficient by making a distinction between

that general duty, and the more specific duty it found sufficient in that case. "The legislative

purpose in requiring the police to enforce individual restraining orders is clearly to protect

named persons for whose protection the order is issued, not to protect the community at large by

general law enforcement activity." *Nearing*, 295 Or at 712, 670 P2d at 143. Rubio has failed to

identify any basis for finding a special duty sufficient to support his claims for negligent

infliction of emotional distress. Accordingly, defendants should be granted summary judgment

against the Tenth, Twelfth, and Fourteenth Claims.

## **RECOMMENDATION**

For the reasons set forth above, Defendants' Motion for Summary Judgment (docket #28)

should be GRANTED as to the First, Third, Fifth, Ninth through Fourteenth Claims, Second

Claim against Helton and the City (except as to failure to train), Sixth Claim against Mayor

Malone, Sixth Claim against City Manager Lazenby, Chief Skelton and the City only as to the

July 2005 arrest, and all Fourteenth Amendment claims, and otherwise should be DENIED.

As a result, the following claims remain for trial:

Second Claim (July 2005 arrest without probable cause) against Chief Skelton;

Fourth Claim (February 5, 2006 stop and search) against Coates and Herrera;

51 - FINDINGS AND RECOMMENDATION

Sixth Claim (failure to train, supervise and discipline) against City Manager Lazenby, Chief Skelton and the City only as to the February 5, 2006 stop and search;

Seventh Claim (false arrest/imprisonment) against the City; and

Eighth Claim (malicious prosecution) against the City.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due **March 21, 2008.**  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

///

///

///

///


If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 4th day of March, 2008.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

52 - FINDINGS AND RECOMMENDATION